IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | * * * * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-17-2860 |
| ENOCH PRATT FREE LIBRARY, *et al.*, | * * * | |
| Defendants. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The Equal Employment Opportunity Commission ("EEOC") brought this action against Defendants Enoch Pratt Free Library ("Enoch Pratt") and the Mayor and City Council of Baltimore (collectively "Defendants"), alleging a violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)(1). ECF 1. Discovery is now complete, and the parties have filed cross-motions for summary judgment. ECF 56, 57. I have reviewed those filings, and the associated oppositions and replies. ECF 58, 59. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons stated below, both motions will be denied.

**I.  FACTUAL BACKGROUND**

The parties have stipulated to many of the relevant facts in this case, ECF 56-3, and the other relevant facts are largely uncontested. Willie Johnson first began working at Enoch Pratt on August 10, 1998, as a security officer. *Id.* ¶ 1; ECF 56-19 at 15:8-9. After some temporary service as a branch manager, Johnson received a formal promotion to Librarian Supervisor I ("LSI") in October, 2006. ECF 56-3 ¶ 2. In FY 2013, Johnson's salary ($56,500) was more than $2000 below the salaries paid to the female LSIs represented by the EEOC in this case. *Id.* ¶ 24-29 (reflecting salaries for the female employees for FY 2013 ranging from $59,300 to $63,900).

Specifically, Ann Marie Harvey began working for Enoch Pratt on March 10, 1997. *Id.* ¶ 9. She was promoted to LSI on January 7, 2002. *Id.* ¶ 10. Her salary for FY 2015 was $62,900 and, for FY 2016, $64,200. *Id.* ¶¶ 36, 42. Carlotta Young began working for Enoch Pratt on August 26, 1989, and was promoted to LSI effective January 28, 2008. *Id.* ¶¶ 11-12. Her salary for FY 2015 was $64,500, and, for FY 2016, $65,800. *Id.* ¶¶ 37, 43. Nancy Yob, who began working for Enoch Pratt on November 3, 1997, was promoted to LSI in August, 2004. *Id.* ¶¶ 13-14. She received a salary for FY 2015 of $62,900 and, for FY 2016, $64,200. *Id.* ¶¶ 38, 44. Linda Schwartz began working for Enoch Pratt on July 23, 1979, and became an LSI in September, 1994. *Id.* ¶¶ 15-16. She received a salary of $65,200 in FY 2014, and $67,800 in FY 2015. *Id.* ¶¶ 33, 39. Julie Johnson was hired at Enoch Pratt on January 1, 1990, and became an LSI on January 2, 2002. *Id.* ¶¶ 17-18. She was paid $60,500 in FY 2014, $62,900 in FY 2015, and $64,200 in FY 2016. *Id.* ¶¶ 34, 40, 45. All of the female LSIs listed above remained employees of Enoch Pratt throughout their tenure.

The job postings for LSI positions have, over time, contained identical requirements in terms of education and work experience. ECF 56-6 – 56-11. The job postings also contain similar, though not identical, summaries of the duties of the positions. *Id.* Enoch Pratt includes twenty-one different neighborhood library locations, plus a mobile services unit. ECF 56-1 at 3. Nineteen of the neighborhood branches, and the mobile services unit, are staffed with LSIs who effectively serve as "branch managers." *Id.* The nineteen different branches have varying numbers of branch staff, varying support from community volunteers, varying numbers of part-time or contractual summer workers, and varying size and building footage. ECF 57-16, Exh. 5 at 290–94. One branch, the Southeast Anchor branch, has both a LSI and a Library Supervisor II (LSII). *Id.* at 295

("For right now, Nancy Yob is, essentially, the Assistant Branch Manager at the Southeast Anchor Branch Library.").

The five female LSIs represented by the EEOC submitted declarations, using parallel formats, to describe the core duties of their positions. *See* ECF 56-4 ¶ 8; ECF 56-5 ¶ 8; ECF 56-65 ¶ 7; ECF 56-66 ¶ 10; ECF 56-67 ¶ 10. Each stated that they have had opportunities to observe other LSIs' duties, including Johnson's, and that they shared the core duties. *See* ECF 56-4 ¶ 9-10; ECF 56-5 ¶ 9-10; ECF 56-65 ¶ 8-9; ECF 56-66 ¶ 11-12; ECF 56-67 ¶ 11-13.

Vera Fattah, a LSII that supervises LSIs, testified that the core duties of the LSI position constituted "key components of our work and like minimum requirements of the job." ECF 57-16 at 281:3-5. In addition to the core duties, Fattah testified about the varying duties and work conditions at the various branches she supervises, and the differences with the job performed by the LSI in the mobile outreach unit, which she also supervised. *See, e.g.*, *id.* at 100.

Similarly, Herbert Malveaux, who serves as Assistant Chief to NLS, testified with respect to the job postings that LSI is "a job that I think really has so many aspects to it on a regular basis. This is a summary. So, we are not expecting it to say everything. These things are things that we could announce to a potential candidate that they do on a regular basis. It just doesn't cover everything." ECF 57-17 at 47:2-8. Further, he said, "I see the duties of the branch manager as being – there is a set of duties I am expecting them to do, and may expand or detract depending on the size of the community they are serving, the demands of the library patrons, and the public, the size of the building, the size of the staff." *Id.* at 4-10. He clarified that, "the position of Librarian Supervisor I is, essentially, the same position, but you would encounter different responsibilities enlarged by their staff, their building, their response to the community . . . In reality, we are expecting more from certain staff and certain buildings to fulfill this role." ECF 57-17 at 12-20.

The uncontroverted evidence reflects that salaries for LSIs are not based upon their branch location. *See* ECF 22 ¶ 12(f)(6); Anderson Dep., ECF 56-20 at 49 (explaining LSI salaries do not change if transferred between branches); Malveaux Dep., ECF 56-18 at 110:9-20

Johnson resigned his LSI position to accept a position in the Cecil County public library system, in February, 2014. ECF 56-3 ¶¶ 3, 4, 8. During his sixteen-month tenure in Cecil County, Johnson worked as the Branch Manager of the main branch in Cecil County, which had a much larger circulation staff than the Enoch Pratt Branches. ECF 56-19 at 69:9-17. In fact, in Cecil County, Johnson supervised approximately seventeen employees, whereas a typical LSI supervises far fewer. ECF 56-19 at 152:6-14. For about 5-6 months, Johnson served as acting Assistant Director for the entire Cecil County Public Library System. *Id.* at 88. He received a corresponding salary increase during that stint. ECF 57-1 at 4. Despite the experience Johnson gained in Cecil County, he grew to believe that co-workers and library patrons in that system were racist, and he sought to return to Enoch Pratt. ECF 56-19 at 88:4-93:11.

Johnson called Eunice Anderson, the then-Chief of Neighborhood Library Services ("NLS") at Enoch Pratt, to discuss the possibility of returning. ECF 57-11 at 79:1-80:11. During one of several phone calls, Johnson and Anderson discussed the possibility of him returning to fill a position that was not yet vacant and had not been posted. ECF 56-1 at 4. Johnson was not required to submit an application or undergo an interview process. *Id.*

As of July 1, 2014, Defendants used the Managerial and Professional Society Salary Policy ("MAPS") system to determine compensation for newly hired LSIs. ECF 22 at 12(f), ECF 57-13. That policy provides, for new hires:

> Upon initial appointment, an employee shall be paid at least the minimum salary of the salary range to which the employee has been appointed. An Agency may negotiate a starting base pay up to the mid-point of the assigned salary range. An

4

> Agency shall not offer a candidate a starting base pay that exceeds the mid-point of the assigned salary range.

ECF 57-13 at 3. The MAPS policy also provides that, "[a]ll former employees returning to City service in a MAPS classification will have their base pay established according to the Starting Pay provisions of this policy," with exceptions for employees returning to service in the same classification within one year of a voluntary resignation or layoff. *See* ECF 57-13 at 6-7. For a LSI, the MAPS policy lists the salary range at $59,600 to $95,400, placing the midpoint at $77,500. ECF 57-9.

After Johnson spoke to Anderson about being rehired, he asked a representative of Enoch Pratt's Human Resources Department, Kim Murphy, whether his current salary in Cecil County could be matched. ECF 57-6 at 126:6-16. Johnson then engaged in an email exchange with Murphy, in which he told her that his current pay rate was $68,135, and requested "the salary we spoke about in writing." ECF 57-7. Murphy responded, copying Anderson and Michelle Sutton, to tell Johnson that a LSI position was available and that he should contact Sutton to "start the rehire process." *Id.* Murphy testified, "[a]nd so if a new employee was requesting a salary, if it did not exceed the midrange, then we could go ahead and give that person the salary if there are no objects - - no objections." ECF 57-10 at 16:8-11. Sutton testified that they "have flexibility now with the MAPS since the study," ECF 57-8 at 64:13-14, and that she is personally negotiating with applicants up to the midpoint. *Id.* at 71:11-15. With respect to Johnson, Sutton got approval from Jack [Kinsella] of the amount in order to send the offer letter. ECF 57-8 at 90:11-17. Sutton knew that Johnson wanted $68,135 from his email to Murphy. *Id.* at 93. She testified that she would not have offered Mr. Johnson a specific amount without Mr. Kinsella's approval. *Id.* at 99:12-18. Murphy testified that "Johnson asked for the salary through Michelle [Sutton]; Michelle

5

presented it to Ms. Anderson, and Ms. Anderson presented it to Jack Kinsella." ECF 57-10 at 131:14-17.

Anderson testified that she, as Chief of the NLS, made the ultimate decision to hire employees to positions in the branches. ECF 57-11 at 31:14-20. She testified that the specific amount of an offer is negotiated between the applicant and HR, and then comes to her for approval. *Id.* at 36:6-11. She further testified, though, that Johnson's situation was the only salary she had to approve, because "it was right after the new MAPS reclassification." *Id.* at 36:12-20. She testified that Kinsella came to talk to her about the request because MAPS was a new system, and because Johnson had been a manager before, but had a different salary in Cecil County and was coming back requesting a higher salary. *Id.* at 37:10-18. Anderson said she approved the salary for Johnson because "this is a new range" and she wanted Johnson back. *Id.* at 38:4-10; *see also id.* at 109:13-18 ("[H]is salary request was within range, the new range, and did I see a problem with our giving him that salary. And, of course, I said, no, I didn't see a problem with it.").

Kinsella testified, "[h]is salary [in] Cecil County may have been higher than it was. In order to obtain his services, that became a concern, and I understood that by the new signature policy, that the manager was authorized to offer up to 50% after the mid range of the job classification salary scale." ECF 57-12 at 105:6-11. Kinsella continued, "[m]y recollection is that I did review it and I did approve it because, in my mind, it seemed to be in conformity with the new policy." *Id.* at 105:14-16. He also had to review and approve the decision to rehire Johnson. ECF 57-12 at 109. He did, because,

> [o]ne of the reasons was that recruitment for librarians is a difficult process because there aren't that many certified librarians, and somebody who has had experience as a library manager would be even a better hire, and somebody who had experience as a manager at Pratt would make that person a unique candidate. Sort of one of a kind. I think it was his one of a kindness that he was a unique

6

> find, because he had been a successful employee when he worked for the library. So, to have him back was a positive type of qualification.

ECF 57-12 at 51:8-18.

Defendants technically re-hired Johnson into a different department than NLS because there were no LSI vacancies at that time. ECF 57-10 at 97:1-21 (explaining that two vacancies were imminent). On June 22, 2015, Johnson returned as an employee of Enoch Pratt, serving as an LSI at a salary of $68,900. ECF 56-3 ¶¶ 5-7, 35. Anderson assigned Johnson temporarily to the Brooklyn Branch, where the LSI, Linda Schwartz, was departing on medical leave. *Id.* ¶ 6; ECF 57-6 at 145–47. In November, 2015, about six months after his return, Johnson took over as LSI at the Northwood Branch, following the LSI's retirement. ECF 56-3 ¶ 7. For FY 2016, Johnson received a salary of $70,300. ECF 56-3 ¶ 41. He worked as an LSI until he received a promotion to Librarian Supervisor II ("LSII") in April, 2017. *Id.* ¶¶ 7-8.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad,* 823 F. Supp. 2d 334, 348 (D. Md. 2011). If the moving party establishes that there is no evidence to support the non-movant's case, the burden then shifts to the non-movant to proffer specific facts to show that a genuine issue exists for trial. *Id.* The non-movant must provide enough admissible evidence to "carry the burden of proof "at trial. *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; rather, there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 252 (1986). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Casey*, 823 F. Supp. 2d at 349. Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. The non-movant "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). If the non-movant fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Casey*, 823 F. Supp. 2d at 348-49. In ruling on a motion for summary judgment, a court must view the facts and inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

III. ANALYSIS

A. THE EPA

The Equal Pay Act ("EPA") bars employers from engaging in gender-based discrimination by paying unequal pay for equal work. *See* 29 U.S.C. § 206(d)(1). To prove a claim under the EPA, a plaintiff must establish a prima facie case of discrimination "by demonstrating that (1) the defendant-employer paid different wages to an employee of the opposite sex (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." *EEOC v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). If a prima facie case is established, the burdens of both production and persuasion shift to the employer. *Maryland Ins. Admin.*, 879 F.3d at 120. The employer must show that the discrepancy in wages is explained by one of four affirmative defenses: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity

8

or quality of output; or (4) a disparity based on any factor other than sex. *See* 29 U.S.C. § 206(d)(1). If the employer fails to meet its twin burdens of production and persuasion on one of those four affirmative defenses, the plaintiff will prevail. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994).

### B. EEOC's Motion for Summary Judgment

Viewing all of the evidence, as I must, in the light most favorable to Defendants for the purposes of adjudicating the EEOC's motion for summary judgment, I find that genuine issues of material fact persist regarding the second and third elements of a prima facie case, *i.e.*, whether all of the LSIs were performing "jobs requiring equal skill, effort and responsibility" and were performing their work tasks under "similar working conditions." *Maryland Ins. Admin.*, 879 F.3d at 120. As described in the factual summary above, the female LSIs represented by the EEOC submitted similarly formatted declarations listing identical "core duties" for the positions. *See* ECF 56-4 ¶ 8; ECF 56-5 ¶ 8; ECF 56-65 ¶ 7; ECF 56-66 ¶ 10; ECF 56-67 ¶ 10. Each opined that they have observed the duties performed by other LSIs, and believe the core duties to be the same.[1] *See* ECF 56-4 ¶ 9-10; ECF 56-5 ¶ 9-10; ECF 56-65 ¶ 8-9; ECF 56-66 ¶ 11-12; ECF 56-67 ¶ 11-13.

In contrast, as described above, numerous witnesses cited by Defendants testified about the wide variety of job duties performed by LSIs at the various library branches. For instance, some branches have no LSI, but are managed by other staff. *See, e.g.,* ECF 57-6 at 28:10-21. One branch has both an LSII and LSI, making the LSI more akin to an assistant manager. *See* ECF 57-

---

[1] The EEOC argues that from August through November of 2015, Johnson's job duties required less "effort, skill, and responsibility" than the duties performed by the Female LSIs, since he was working in tandem with an LSI who was teleworking upon the conclusion of her medical leave. ECF 56-1 at 8-9. Although the factual circumstances during that window may differ from the circumstances before and after those dates, there is still a genuine issue of material fact regarding the nature of the duties each LSI performed. Moreover, as discussed below, even if the EEOC had established a prima facie case during that or some other window, a genuine issue of material fact would remain regarding the validity of Defendants' affirmative defense, thus precluding summary judgment.

9

6 at 188:7-18. Additionally, at the mobile services unit, LSIs have a somewhat unique experience both in terms of their responsibilities and the environment itself. *See, e.g.*, ECF 57-16 at 100, 250 (explaining that in the mobile unit, LSIs supervise a driver, manage a smaller physical space, and hire and supervise part-time summer employees). Overall, the branches generally have varying responsibilities in light of their different physical plants, different clientele, and different community resources. *See generally* Malveaux Dep., ECF 57-17; Fattah Dep., ECF 57-16. A factfinder should therefore assess whether the duties performed by LSIs are sufficiently similar to establish a prima facie case of unequal pay for equal work.[2]

### C. Defendants' Motion for Summary Judgment

Defendants' Motion is governed by *Maryland Ins. Admin.,* 879 F.3d 114 (4th Cir. 2018), which essentially precludes summary judgment in favor of Defendants in the instant matter. In that case, the EEOC brought an action on behalf of three female investigators at the Maryland Insurance Administration ("MIA"), alleging that they were paid less than male investigators at their agency, in violation of the EPA. *Id.* at 116–19. MIA employs the Standard Pay Plan Salary Schedule promulgated by Maryland's Department of Budget and Management. *Id.* at 116. Under that schedule, MIA assigns each new employee to a "grade level" for his or her position, which has an assigned base salary and twenty separate steps within the grade level's salary range. *Id.* at 116–17. A new hire's step placement is determined based on his or her "prior work experience, relevant professional designations, and licenses or certifications." *Id.* at 117. Other factors that may affect a new hire's step level include any difficulty in recruiting for the position, and any credit the new employee may have accrued for prior years of service in state employment. *Id.*

---

[2] As explained below, even if Plaintiff could establish the prima facie case, there are genuine questions of material fact regarding whether Defendants could establish one of the four statutory affirmative defenses.

10

The three female investigators represented by the EEOC, and the four designated male comparators, all were hired in the position of Fraud Investigator at grade level 15. *Id.* at 117–19. The female investigators were assigned initial step levels of four or five, and the male comparators were assigned initial step levels of five, six, or ten. *Id.* After considering the parties' cross-motions for summary judgment, the district court held that the EEOC failed to meet its burden to establish a prima facie case of unequal pay, because the male investigators had been hired at higher steps than the female investigators, and because the disparity in initial step assignments was attributable to the investigators' relative experience and qualifications. *Id.* at 119.

The Fourth Circuit vacated the district court's order and remanded the case for trial. The court reasoned that, "[w]hile an employer may be entitled to summary judgment on an EPA claim if the employer establishes an affirmative defense as a matter of law, the burden on the employer necessarily is a heavy one." *Id.* at 120-21 (citing *Mickelson v. N.Y. Life Ins. Co.,* 460 F.3d 1304, 1312 (10th Cir. 2006); *Stanziale v. Jargowsky,* 200 F.3d 101, 107–08 (3d Cir. 2000)). In accordance with the standard adopted by the Tenth and Third Circuits, the Fourth Circuit held that "once the plaintiff has established a prima facie case the employer will not prevail at the summary judgment stage unless the employer proves its affirmative defense so convincingly that a rational jury could not have reached a contrary conclusion." *Maryland Ins. Admin.*, 879 F.3d at 121. The *MIA* Court ultimately concluded that the Standard Salary Schedule employed by the agency was facially neutral; nonetheless, the fact that MIA exercised discretion each time it assigned a new hire to a particular step meant that a factfinder could determine that MIA "at least in part based its assignment of the claimants' step levels on their gender with a resulting diminution of their assigned starting salary." *Id.* at 123. The Fourth Circuit acknowledged that the relative qualifications, certifications, and employment history of the female claimants and the male

11

comparators "*could* explain the wage disparity between the claimants and the conspirators," but noted the absence of "any contemporaneous evidence showing that the decisions to award [the male comparators] their starting salaries were *in fact* made pursuant to their aforementioned qualifications." *Id.* In the absence of evidence compelling a jury to make a finding in favor of MIA, the Fourth Circuit reversed the award of summary judgment.

As in *MIA*, Defendants contend that any wage differential is justified by the fourth affirmative defense, *i.e.*, a disparity based on any factor other than gender. Moreover, the circumstances here are similar to those in *MIA*, particularly in terms of the discretion afforded to the hiring agency. The MAPS policy implemented in July of 2014 is facially neutral, and clearly permits Johnson, as a new hire, to be paid the starting salary he received. ECF 57-13. However, the MAPS policy does not necessarily compel any specific salary to be awarded to a new hire, introducing some element of discretion. *See* ECF 57-14 (guidance from Human Resources explaining that the MAPS policy "gives Agencies the ability to negotiate a starting salary up to the mid-point of the range without a justification documenting the Agencies [sic] recruitment difficulty for the classification."). In this case, the evidence described above reflects that Johnson asked for Enoch Pratt to match the salary he was earning in Cecil County. Because his demand was within the permitted range (and, in fact, somewhat below the maximum), the agency agreed to pay him in accordance with (and slightly higher than) his request. A jury certainly could find that the fact that Johnson, unlike each of the female claimants, was hired under the new MAPS policy upon his return from Cecil County provides a facially neutral reason for the disparity in his pay. Johnson's salary appears to be in line with the practice that developed for hiring under the new policy. *See* ECF 57-14 at 4 (HR guidance several months after enactment of the MAPS policy, stating, "Although the Salary Policy provides agencies with flexibility to use the entire range

12

between the minimum and the mid-point, the practice in the field reflects that new hires are generally recruited with starting salaries at or above the mid-point of the range."). The female claimants' salaries were dictated by the existing salary structures over their long tenures, since none of them ever left the agency for more than one year to trigger application of the 2014 MAPS policy. Thus, a jury could conclude that Johnson's salary did not result from an arguably unequal application of the same pay structure, as in *MIA*, but an application of the entirely different pay structure in effect on the date of his rehire.

Even so, although these facially neutral reasons may explain Johnson's rehire, a rational jury could find that the ultimate pay discrepancy was due, at least in part, to gender. Johnson was rehired at a rate not only higher than the female LSIs represented by the EEOC, but also significantly above the salary he had received during his first tenure at Enoch Pratt. Given these facts, combined with the inherent discretion within the MAPS policy, genuine factual questions exist about how Defendants arrived at Johnson's salary. Furthermore, a jury could find that the reasons proffered by Defendants were not, in fact, the reasons for the disparity in Johnson's pay upon his return. Accordingly, there are genuine factual questions about whether Defendants can establish one of the four affirmative defenses, and therefore, summary judgment is unwarranted.

## CONCLUSION

For the reasons set forth above, both parties' motions for summary judgment will be DENIED. A separate Order follows.

Dated: October 30, 2019

/s/
Stephanie A. Gallagher
United States District Judge