**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES EQUAL EMPLOYMENT    *
OPPORTUNITY COMMISSION,

                                    *

      Plaintiff,

                                    *

   v.                                                Civil Action No. 8:17-cv-02860-PX

                                    *

ENOCH PRATT FREE LIBRARY *et al.*,

                                    *

      Defendants.

                                    ***

## MEMORANDUM OPINION

      This Equal Pay Act case concerns the salaries paid to the Librarian Supervisors employed at Baltimore's Enoch Pratt Free Library.  Plaintiff United States Equal Employment Opportunity Commission ("EEOC") brought suit on behalf of five female librarians ("Claimants")[1], asserting that the Library failed to pay the Claimants an equal salary for equal work, in contravention of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)(1).  ECF No. 1.

      At trial, the EEOC's liability theory was straightforward.  It maintained that the Library violated the EPA because it paid a male Librarian Supervisor-1 (LS-1), Willie Johnson, more than the five female Claimants for performing the same work.  The Defendants, in response, maintained that the EEOC could not demonstrate the work performed was indeed sufficiently similar to trigger an EPA violation, and even if it could, any pay differential was based on "a factor other than sex" or for reasons other than because Johnson is a man.

      After reviewing the evidence, testimony, and argument, the Court concludes that Defendants have violated the EPA and Claimants are entitled to an award of the stipulated back

---

[1] The Claimants are Ann Marie Harvey, Linda Schwartz, Carlotta Young, Nancy Yob, and Julie Johnson.

wages and liquidated damages.  The Court begins with its findings of fact and then turns to its conclusions of law.

## I.      Findings of Fact

### A.  Librarian Supervisor-1 Position at Enoch Pratt

The Enoch Pratt Free Library is the public library system for Baltimore City, consisting of twenty-one separate branches and two mobile Library vehicles.  *See* Trial Tr. Vol. III, 20, 26. Although branches differ in the size of the structure, collections, and demographics of the neighborhood population served, each employs at least one branch manager, generally a Librarian Supervisor-1 ("LS-1"), who is tasked with the day-to-day administration of the branch. *Id.*, 16, 20, 26.

The training, experience, and qualifications for the LS-1s are largely the same.  All LS-1s must have, at a minimum, a Master's Degree in Library Science or Library Information Sciences. Additionally, LS-1s must have amassed at least three years' work experience in a library setting, with at least one year spent supervising library staff.  Pl. Exs. 15-22.

At the Library, all LS-1s also share a common core of duties in five domains: (1) supervising staff, (2) facilities management, (3) overseeing the book and media collection, (4) community outreach and programming, and (5) communicating with the Library's administrators.  *See, e.g.*, Trial Tr. Vol. I, 46-47; Vol. II, 16-17; Pl. Exs. 28-33.  As to supervision, all LS-1s perform essentially the same function.  *See* Pl. Exs. 22, 28-33; Trial Tr. Vol. I, 208-09.  They create staff schedules and track leave schedules of Library employees to ensure their respective branches are appropriately staffed.  Trial Tr. Vol. I, 47.  They also perform regular staff evaluations and make recommendations for staff trainings, professional growth, and, when necessary, disciplinary action.  Trial Tr. Vol. I, 47, 144-45; Vol II, 28-29.

As to facilities management, LS-1s maintain the branch's physical facilities by directing custodial and maintenance staff efforts to keep the physical space clean and the branch's technology fully functional. This often requires communicating with Library administration to set up repairs and maintenance. Trial Tr. Vol I, 48-49, 205; Vol. II, 17-18. LS-1s also must handle such varied issues as broken heating and cooling systems, electrical outlet problems, computer technology malfunctions, building damage, and more. *See* Trial Tr. Vol. I, 48-49; Vol. II, 17-18, 96. In recent years, certain branches in the system underwent major renovations, during which the LS-1s worked with architects on building designs and layouts, ordered new branch supplies, and coordinated efforts to move and store collections materials. *See* Trial Tr. Vol. I, 197; Vol. II, 95-96.

Regarding collections, all LS-1s must ensure the books and media available are updated and reviewed at the LS-1's respective branch. Each branch receives a monthly "Dusty Book" report, highlighting specific areas in the Library's collections that may need attention. Trial Tr. Vol. I, 149. LS-1s then cull their collections, getting rid of outdated or damaged books, and consider adding new materials based on community needs. *Id.*; Vol. II. 34-35.

All LS-1s also must oversee any branch-specific programming activities, and public outreach efforts. Trial Tr. Vol. I, 49, 100-01; Vol. II, 106. Every branch hosts a variety of adult and children's programs throughout the year. *See, e.g.*, Trial Tr. Vol. II, 24-25. These activities include children's after school and homework programs, adult financial literacy, art, and fitness classes, and reading programs. Trial Tr. Vol. I, 49, 88; Vol. II, 49, 106. For this programming, LS-1s reach out to schools, local businesses, and community organizations in the surrounding neighborhood to drum up interest in the branch's various programs. Trial Tr. Vol. I, 49, 77. LS-

1s also ensure that the facilities and staff are equipped to host the programs.  Trial Tr. Vol. I, 76; Vol. II, 44.

Each branch hosts, and the LS-1s direct, volunteers who aid in Library programs—such as tutoring—and with general projects.  Trial Tr. Vol. I, 71-73; Vol. II, 112.  Some volunteers are associated with "Friends" groups, which are non-profit organizations dedicated to supporting branches financially and with volunteers.  Trial Tr. Vol. I, 57-58; 224; Vol. II, 33-34 (discussing the Friend of the Brooklyn Library group).  While all branches have volunteers, not all branches have "Friends" groups.  Trial Tr. Vol. I, 57-58.  For those branches that do, LS-1s work closely with the groups to coordinate volunteers and develop programs, all the while carefully handling the relationship between the Library and the organizations.  Trial Tr. Vol. I, 57-58; Vol. II, 34.

As to communication with Library administrators, LS-1s are the primary point of contact between the Enoch Pratt administration and the branches.  For example, every LS-1 must generate monthly and other periodic reports regarding staffing, collections management, and circulation size.  Trial Tr. Vol. I, 206; Vol. II, 21-22.  They also enter branch staffs' time and leave into the Library's "e-time" payroll system.  Trial Tr. Vol. I, 144-45; Vol. II, 28.  Relatedly, the LS-1s attend regular meetings and retreats together where they discuss strategic planning and programming.  Trial Tr. Vol. I, 53-55, 206-07, 215.

Given the substantial similarity of duties among all LS-1s, it is not surprising that the Library treats all LS-1s as fungible.  The Library does not recruit LS-1s for specific branch openings; rather, job postings are generalized to the position.  Trial Tr. Vol. II, 38, 140; Vol. III, 55-56; *see, e.g.*, Pl. Exs. 20-22.  Likewise, the Library transfers LS-1s from branch to branch, on a short- or long-term basis, and wherever they are needed.  Transfers are effectuated often with little notice, and the transferring LS-1 has little say in the transfer.  Trial Tr. Vol. III, 28-30; Vol.

II, 83-4.  LS-1s also regularly act as substitutes for one another across branches.  Trial Tr. Vol.

II, 30.  When an LS-1 transfers or acts as a substitute, the Library does not provide any branch

specific training, nor does the LS-1's pay change at all.  *Id.* 29-32; Vol. III, 58.  Indeed, LS-1s

remain in the same employment category whether they worked at a branch on a permanent or

substitute basis.  Trial Tr. Vol. I, 188-89; Vol. II, 31-32.

### B.  Citywide Changes in Salary Policy

In July 2014, City agencies, including the Library, implemented a new citywide salary

system that applied to all city Managerial and Professional Society (MAPS) positions.  Def. Exs.

6, 7; Trial Tr. Vol. III, 142.  MAPS is a public employee society made up of city employees who

work with City and labor officials regarding changes to employee benefits.  Trial Tr. Vol. IV, 11-

12.  Under the prior salary plan, employees were paid according to a step system whereby

employees' salaries increased based on years of service.  Trial Tr. Vol. IV, 8-9.  In contrast, the

new salary policy, AM 205-20, gave agency human resources departments broader discretion in

setting starting salaries to make the city positions more competitive in recruitment and retention.

Trial Tr. Vol. III, 141-42; Vol. II, 168.

Under AM 205-20, agencies such as the Library could offer a new employee a starting

salary at any point within a prescribed salary range.  These ranges were fixed by position and

delineated a minimum, midpoint, and maximum salary available.  Trial Tr. Vol. IV, 9; Vol. II,

168-70.  When hiring new MAPS employees, an agency could independently offer salaries up to

the mid-point for the position, but any salaries above the mid-point required prior approval by

the City's human resources department.  Trial Tr. Vol. IV, 13, 15; Vol. V, 54-56.  At the Library,

applicant qualifications and any unique or important attributes relevant to certain Library needs

often resulted in salary offers somewhere above the minimum but below the midpoint.  Trial Tr. Vol. V, 53-55, *see also* Vol. IV, 45.

When AM 20-205 was issued, the City human resources department circulated written guidance on its implementation.  This guidance cautioned agency human resources departments that the new policy could result in pay disparities between new hires and existing employees. Pertinent to this case, this guidance emphasized:

> Agency Heads and hiring managers are strongly encouraged to exercise this flexibility [in offering salaries up to the MAPS midpoint] with discerning and discriminating judgment, such that salary determinations are sustainable against their budget on a continuing basis and do not create *adverse internal equity issues.*

Def. Ex. 7 at 11789 (emphasis added).

Johnson was one of the first LS-1s to be hired under the MAPS policy.  Trial Tr. Vol. V, 88; *cf.* Vol. III, 152.  The Library's Human Resources department, lead at the time by Jack Kinsella, was responsible for formally offering Johnson his salary pursuant to MAPS.  Trial Tr. Vol. III, 156.  However, no record evidence supports that anyone at the Library conducted any due diligence to confirm that Johnson's salary on rehire as an LS-1 would not create any "equity issues" with any other LS-1s.  *See* Trial Tr. Vol. II, 177-78; Vol. V, 93-94.

### C.  The Claimants' Jobs as LS-1s

Each of the five Claimants have enjoyed decades-long careers in the Enoch Pratt system.  Each has worked at scores of branches of varying size and demographics.  *See, e.g.*, Trial Tr. Vol. I, 126; Vol. II, 87.  Each also had been at the Library, and employed as an LS-1, for a longer period than had Johnson.  *Compare* J. Ex. ¶¶ 1-8 *with* J. Ex. ¶¶ 9-10 (Harvey started at Library in 1997 and became an LS-1 in 2002),  ¶¶ 11-12 (Young started in 1989 and became an LS-1 in 2008), ¶¶ 13-14 (Yob started in 1997 and became an LS-1 in 2004), ¶¶ 15-16

(Schwartz started in 1979 and became LS-1 in 1994), ¶¶ 17-18 (Julie Johnson started in 1990 and became LS-1 in 2002).

The Claimants have also all taken on special assignments within the Library system. For example, Yob leads the Library's training academy for new librarians, Trial Tr. Vol. I, 34-35, 58. Young has served on various Library committees and literary associations. *Id.* 136, 154-55. Julie Johnson led the roll out of the Library's new inventory and anti-theft system and assisted in overseeing the Roland Park branch's renovations. *Id.*, 194, 197-98. Schwartz was on staff and book award committees, reading committees, and attended an international library conference. Trial Tr. Vol. II, 50-52. And Harvey served on various Library committees including the Best Practices Group and certain strategic planning and programming committees. *Id.*, 114.

Several of the Claimants also had earned impressive professional credentials and accolades. Young received staff awards for customer service, Employee of the Month, and Branch of the Year on two occasions. *See* Trial Tr. Vol. I, 155-56, Pl. Ex. 125-26. Julie Johnson received Employee of the Month, Customer Service Award, Supervisor of the Year, and her staff received a group award. Trial Tr. Vol. I, 197-99, 201. Harvey attended a selective city-wide supervisory training and her branch received special recognition from the Mayor and City Council for hosting a well-received book festival. Trial Tr. Vol. II, 84-85, 110; Pl. Exs. 115, 116.

All Claimants also had worked as LS-1s at multiple branches over their long careers. Yob served as branch manager at the Hamilton, Edmondson, and Walbrook branches. Trial Tr. Vol. I, 23, 39. Although Young primarily managed the mobile services vehicles, she also acted as an LS-1 at the Patterson Park, Southeast Anchor, and Clifton branches. *Id.* 126-27. [2] Julie Johnson

---

[2]      Defendants argue that Young's position as LS-1 of the mobile book branch set her apart from the other Claimants and Johnson. The Court finds that Young's prior positions at brick and mortar branches belie this

served at the Hamilton, Hampden, Roland Park, and Northwood branches.  *Id.* 183-84, 189.

Harvey worked at the Cherry Hill, Waverly, Northwood, and Clifton branches.  Trial Tr. Vol. II,

83-84, 89.  And Schwartz was at the Brooklyn, Waverly, Patterson Park, and Camden branches.

*Id.*, 32.

The LS-1s also all had comparable or superior records and performance evaluations as

compared to Johnson.  Pl. Exs. 34-58; 65-69.  The Library provides regular performance

evaluations for LS-1s.  In the late 2000s, the Library used the following categories:  1 – Does

Not Meet Expectations, 2 – Partially Meets Expectations, 3 – Fully Meets Expectations, 4 –

Exceeds Expectations, 5 – Excellent.  *See, e.g.*, Pl. Ex. 36 at 722.  Sometime between 2008 and

2010, the Library modified the evaluation metrics as follows: 1 – Unacceptable, 2 – Needs

Improvement, 3 – Meets Standards, 4 – Exceeds Standards, and 5 – Far Exceeds Standards.  *See,*

*e.g.*, Pl. Ex. 54.  As an LS-1, Johnson consistently received "meets" expectations and standards

ratings, with one supervisor noting early on that Johnson had difficulties with staff scheduling.

Trial Tr. Vol. V, 100; Pl. Exs. 36, 43, 47, 55. 67.  For the same period, the Claimants received

performance ratings of at least "meets" standards, and at times each received "exceeds"

standards evaluations.  *See, e.g.*, Pl. Exs. 44, 48, 52, 57, 58.

To be sure, the record also reflects that the LS-1s do not function with perfect identity.

Claimants, on occasion, devoted more time to a particular outreach project, or a facility

renovation.  *See* Trial Tr. Vol. I, 196-97.  At other times Claimants' focused on updating their

---

contention.  Trial Tr. Vol. I,  126-28; 147.  Moreover, although the mobile book branch maintained smaller
collections and staff on the mobile units, they were responsible for servicing a larger geographical area.  Pl. Ex. 5.
As the mobile book LS-1, Young was also stationed at a brick and mortar branch where she maintained a separate
collection used to stock the mobile units.  Trial Tr. Vol. I, 174-75.  She also oversaw the mobile unit's maintenance
and repairs, akin to management of brick and mortar facilities.  Trial Tr. Vol. I, 144-45;  Vol. III, 79-80.  And like
the other LS-1s, she managed branch collections, regularly communicated with Library administration, and oversaw
programming.  Trial Tr. Vol. I,133-35, 149.  By all accounts, Young's duties were substantially similar to other LS-
1s.  *See, e.g.*, Trial Tr. Vol. III, 79-83.

collections or assisting in branch training.  *See id.*, 87; 104-05.  But these job differences did not alter their basic responsibilities and duties as LS-1s.  *See, e.g.*, Trial Tr. Vol. I, 63-65, 159-60, 192-94, 215-16; Vol. II, 54, 116; Vol. III, 84, 118.

The Claimants and Johnson's own self evaluations buttress this point.  In 2015, Library administration asked each LS-1 to create individual position descriptions for their supervisors to use for future performance evaluations.  Trial Tr. Vol. I, 150-52; Vol. III, 37-39; *see* Pl. Exs. 28-33.  LS-1s collaborated on the position descriptions, drafting general categories of essential job functions, and sharing their position descriptions with one another on occasion.  Trial Tr. Vol. I, 150-51; Vol. III, 38.  The LS-1s then completed individual forms, and in their own words, described their essential functions and allocated an individualized estimate of the percentage of time spent on each function.  Pl. Exs. 28-33.

These self-evaluations reflect significant overlap in the LS-1s' essential job function descriptions, with nearly all of the LS-1s listing "direct[ing] operations, activities, programs, and staff" as taking up the lion's share of time, and describing tasks such as collection management, building maintenance, and continuing education, such as attending conferences, as essential functions.  Pl. Exs. 28-33.  Variations were minor and reflected the LS-1s individualized professional goals.  Trial Tr. Vol. III, 39-40.  While the Library used these self-assessment forms for performance evaluations, the forms had no impact on LS-1 salaries.  *Id.*

### D.  Willie Johnson's Tenure with the Library

Although the Library hired Johnson as an LS-1 in 2015, this was not his first stint at Enoch Pratt.  In 1998, Johnson was hired as a security guard for the Library.  J. Ex. ¶ 1.  He then worked himself up the supervisory librarian ladder, receiving his Master's degree in library information science in 2001 from the University of Pittsburgh.  Trial Tr. Vol. III, 90-91.  In

9

October 2006, Johnson was promoted to LS-1 and worked in that capacity until February 2014. J. Ex. ¶¶ 2-3; Trial Tr. Vol. III, 99.

In 2014, Johnson left Enoch Pratt to become branch manager of the Elkton Library, Cecil County's main branch. Trial Tr. Vol. III, 101. For a time, Johnson served as acting assistant director at the Elkton branch and ran that library's small business center. *Id.* 103. At Cecil County, Johnson acquired additional leadership opportunities beyond that commensurate with an LS-1 at Enoch Pratt. Trial Tr. Vol. V, 61.

Eventually, Johnson wished to return to Enoch Pratt. Trial Tr. Vol. III, 107-08. He had stayed in touch with Eunice Anderson, the Chief of Neighborhood Library Services, and often discussed with her the work he was doing at the Elkton branch. *Id.*, 108-109, 121. In 2015, Johnson contacted Anderson to inquire of any vacancies at the Library for an LS-1. *Id.*, 107-09; Vol. V, 61-62. Anderson responded swiftly in rehiring Johnson. Specifically, Anderson knew that two experienced LS-1s would be retiring in short order, and that Johnson's prior and current experience made him an attractive candidate for either position. Trial Tr. Vol. V, 62-64.

The Library dispensed with hiring formalities as to Johnson. He neither interviewed nor submitted a resume or any documentation regarding his bona fides. Trial Tr. Vol. II, 143-44. Vol. III, 155-57. Instead, Anderson referred Johnson to the Library's Human Resources department to process his immediate rehire. Trial Tr. Vol. III, 108; Vol. V, 63. Anderson further emphasized that at no point did she discuss with Johnson the salary he would be paid upon rehire, as is her general practice to avoid discussing salaries with any applicants. Trial Tr. Vol. V, 66-68.

Johnson next heard from Human Resources Generalist, Kim Murphy, to begin the rehiring process. Murphy asked Johnson for his current salary at Cecil County. Trial Tr. Vol III,

23; Vol. IV, 18, 21-22; Pl. Ex. 103.  According to Murphy, Johnson requested that the Library match that salary, although Johnson did not recall having any such discussion.  Trial Tr. Vol. III, 123; Vol. IV, 22-24.  Murphy next directed Johnson to Human Resources Recruiter, Michelle Sutton, whom Murphy believed would handle salary negotiations.  Trial Tr. Vol. IV, 22-24; Pl. Ex. 103.

Jack Kinsella, Chief of Human Resources for the Library, claimed to have simply offered Johnson the salary that Murphy had recommended.  Trial Tr. Vol. III, 156-57.  Gordon Krabbe, Chief Operations Officer for the Library, approved of Johnson's salary offer, but did not make the hiring decision, and had assumed Anderson had too blessed Johnson's starting salary.  Trial Tr. Vol. II, 147.

Although Johnson had amassed supervisory experience at Cecil County, little evidence suggests that Johnson's starting salary at the Library was related to his time at Cecil County.  In fact, the record is not at all clear as to who set Johnson's salary, and there were no meaningful salary negotiations.  Trial Tr. Vol. III, 112-13, 125.  Nor did Johnson submit any formal documentation that reflected that his starting salary was based on additional experience or newfound qualifications.  Krabbe testified that he believed Johnson an especially good hire not only because of his past tenure at Library, but also because the Library often struggled to recruit African American male librarians.  Trial Tr. Vol. II, 148.  Johnson's starting salary of $68,900 was indisputably higher than that of the Claimants.  *Compare* J. Ex.  ¶ 35 *with* ¶ 36 (Harvey - $62,900); ¶ 37 (Young - $64,500); ¶ 38 (Yob - $62,900); ¶ 39 (Schwartz - $67,800); ¶ 40 (Julie Johnson - $62,900).

### E.  Johnson's Responsibilities upon Rehire

When Johnson first returned to the Enoch Pratt system, he was assigned to the Brooklyn branch as an LS-1.  J. Ex. ¶ 6.  Specifically, he served as a long-term substitute for Claimant Schwartz, who had been the LS-1 at that branch until she had to take extended medical leave. Trial Tr. Vol. II, 40-41; Vol. III, 113.  The record reflects that even while Johnson assumed LS-1 duties, Schwartz maintained contact with him and the staff, and continued to perform some functions related to staff scheduling, timekeeping, and coordinating programs.  Trial Tr. Vol. II, 42-45.  When Schwartz returned in August 2015, Johnson remained at the branch, and the two shared LS-1 duties.  *See* Trial Tr. Vol. II, 45-48; Vol. III, 114.

In November 2015, the Library transferred Johnson to the Northwood branch to take over for LS-1, Sylvia Coker, who would soon retire.  Trial Tr. Vol. III, 115.  Johnson overlapped with Coker for a period and then became Northwood's sole LS-1 when Coker retired.  *Id.*  When Johnson transferred from Brooklyn to Northwood, his salary remained the same, even though Northwood is considered to have a larger service population.  *See id.*, 115, 170; Pl. Ex. 5.

### F.  Claimant Harvey Alerts Library to Pay Disparity

In fiscal year 2016, Johnson's salary increased to $70,300 while the Claimants's salaries remained substantially lower.  *Compare* J. Ex. ¶ 41 *with* ¶ 42 (Harvey - $64,200); ¶ 43 (Young - $65,800); ¶ 44 (Yob - $64,200); ¶ 45 (Julie Johnson - $64,200).  Claimant Harvey learned of this pay differential by examining Baltimore's open source pay data online.  Trial Tr. Vol. II, 117-18; Pl. Ex. 106 at 117.  In response, she contacted the Library's Human Resources department to bring the disparity to the Library's attention.  Trial Tr. Vol. III, 117-18; Pl. Ex. 106. Specifically, Harvey discussed her concerns with Kinsella, who responded that the Library would investigate the pay differential.  Pl. Ex. 106; Trial Tr. Vol. II, 120.

Kinsella conducted an investigation and Krabbe, who also functioned as the Library's EEOC Officer, then reviewed and approved the investigation's findings in a written report. J. Ex. ¶ 20; Pl. Ex. 112 at 25; Trial Tr. Vol. II, 152-54. The investigation report concluded that the pay differential was supported because the MAPS policy permitted the salary and because it accounted for Johnson's experience at Cecil County. Pl. Ex. 112 at 24. The report also recommended that Human Resources conduct a broader investigation to address perceptions of unequal treatment among the LS-1s. *Id.* at 25. This follow-up inquiry appears to never have occurred. Harvey did not receive a salary adjustment as a result of this investigation. *Id.*; Trial Tr. Vol. II, 122, 152-54.

Harvey next filed a formal charge with the EEOC on August 10, 2016. Trial Tr. Vol. II, 122; Pl. Ex. 109. Human Resources, in response, contacted Harvey and directed that she seek what the MAPS policy termed as an "in-range adjustment" (IRA) so that the department could reevaluate her salary. Trial Tr. Vol. II, 128-29; Pl. Ex. 157. Harvey complied, and submitted evidence reflecting the comparability of her duties and responsibilities with Johnson's. Pl. Ex. 157.

In Spring of 2017, Krabbe initially approved Harvey's IRA request, after some unexplained delay. Trial Tr. Vol. IV, 39-41. However, Krabbe then abruptly withdrew the IRA. Trial Tr. Vol. IV, 41; Vol. II, 158-59, 165-67. Krabbe candidly admitted that he withdrew the IRA because Harvey had filed an EEOC charge. Trial Tr. Vol. II, 158-59, 165-67. Krabbe specifically noted that the withdrawal was particularly warranted because to accord Harvey her requested salary increase may have "far greater ramifications" relative to other Enoch Pratt employees. Trial Tr. Vol. II, 158-59. The Claimants' salaries were not adjusted to fall in line with Johnson's until July 2019. J. Ex. ¶ 48.

### G.  Difference in Salaries Accorded Johnson and the Claimants

The parties have stipulated that if the EEOC prevails, the difference in pay between

Johnson and the Claimants warrants backpay awards as follows:

| | |
|---|---|
| Harvey | $25,801.16 |
| Schwartz | $1,040.88 |
| Young | $18,929.86 |
| Yob | $25,801.16 |
| Julie Johnson | $25,801.16 |

J. Ex.  ¶¶ 49-53.

The Claimants are also a part of the Maryland State Teacher's Pension System, which

calculates an employee's pension at retirement based on the employee's salary for the three years

prior to retirement.  Pl. Ex. 156 at 21; Trial Tr. Vol. I, 68-69, 160, 216; Vol. II, 55, 131.  Given

that the Claimants have either retired or are nearing retirement, the historic pay discrepancy

likely would be relevant to calculation of their retirement benefits.  *Id.*

## II.    Conclusions of Law

After a five-day bench trial, this Court concludes that Defendants violated the EPA.

Claimants are thus entitled to back wages and corresponding adjustments to their retirement

plans, as well as liquidated damages.

The Equal Pay Act of the Fair Labor Standards Act ("FLSA") prohibits employers from

discriminating on the basis of sex in the wages paid to employees.  29 U.S.C. § 206(d)(1).  To

sustain an EPA claim, the plaintiff must first establish a prima facie case.  *EEOC v. Md. Insur.*

*Adm.*, 879 F.3d 114, 120 (4th Cir. 2018) (citing *Brinkley-Obu v. Hughes Training Inc.*, 36 F.3d

336, 344 (4th Cir. 1994).  A plaintiff, in particular, must demonstrate by a preponderance of the

evidence, that (1) the defendant paid her lower wages than her male counterpart; and (2) the plaintiff performed equal work requiring equal skill, effort, and responsibility as compared to her male co-worker.  *Id.*; *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (citing 29 U.S.C. § 260(d)(1)).  Establishing a prima facie case creates a presumption that the defendant has violated the EPA.  *Md. Insur. Adm.*, 879 F.3d at 120.

On the question of equal work, the fact finder must determine "whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical."  *Brewster*, 788 F.2d at 991 (quoting *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d. Cir. 1985)).  If the jobs share a "common core" of duties, then the fact finder must determine whether any additional duties make the jobs "substantially different."  *Id.*  Notably, a plaintiff need not make showing of discriminatory intent.  *Md. Ins. Admin.*, 870 F.3d at 120 (citing *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992)).

Once a plaintiff has established a prima facie case, the burden of persuasion and production shifts to the defendants to prove that the pay differential is justified under one of the statutorily enumerated exceptions under the EPA.  *Md. Insur. Adm.*, 879 F. 3d at 120 (citing *Brinkley-Obu*, 36 F.3d at 344).  Specifically, a defendant may avoid liability upon a showing that the wage differential is based on "i. a seniority system; ii. a merit system; iii. a system which measures earnings by quantity of quality of production; or, iv. a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974).  In this matter, Defendants invoke only the fourth exception to the prima facie case.

Defendants' burden to prove a wage differential is justified by "a factor other than sex is a heavy one."  *Brewster*, 788 F.2d at 992.  Defendants must "submit evidence" from which the

Court "could conclude not simply that the employer's proffered reasons *could* explain the wage disparity but that the proffered reasons *do in fact* explain the wage disparity." *Md. Insur. Adm.*, 879 F.3d at 121 (citing *Stanziale v. Jargowsky*, 200 F.3d 101, 107-08 (3d. Cir. 2000); *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006)) (emphasis in original).  With this standard in mind, the Court turns first to the EEOC's prima facie case and next to the Defendants' fourth exception.

### A.  The Prima Facie Case

The Court concludes that the EEOC has demonstrated that claimants were paid less than Johnson, the male comparator, for work of substantially equal skill, effort, and responsibility.  As to the pay differential, the parties have stipulated that Johnson was paid more than Claimants.  J. Ex.  ¶¶ 35-45.  Johnson's starting salary of $68,900 was higher than that of each Claimant -- Schwartz, Yob, Young, Harvey, and Julie Johnson.  The same was true in the next fiscal year when Johnson's salary increased to $70,300.  *Id.*  Thus, the EEOC has clearly established the first prong of the prima facie case.

The parties vigorously dispute that the EEOC has established by preponderant evidence the second prong -- whether the Claimants performed "substantially equal work" to Johnson.  *Brewster*, 788 F.2d at 991.  The Claimants, however, have demonstrated sufficiently that their duties, as compared to Johnson's, are all substantially similar.

First, both the Claimants and Johnson had nearly identical position descriptions.  LS-1 branch managers all "plan, administer and supervise the delivery of services provided by a Pratt Library neighborhood branch."  Pl. Exs. 20-22.  Next, the Claimants and Johnson testified to performing core duties in the five discrete areas of responsibility.  They all managed branch collections, supervised branch staff, maintained the physical facility, interacted with the

administration on payroll and personnel issues, and oversaw public outreach and programming. *See, e.g.*, Trial Tr. Vol. I, 46-47, 133-36, 145-46; *see also* Pl. Ex. 28-33, 41.  Each of the Claimants credibly testified that these duties required the same qualifications, skill, effort, and responsibility regardless of branch assignment.  Trial Tr. Vol. I, 63-65, 159-60, 192-94, 215-16; Vol. II, 54, 116; *see also* Vol. III, 84.

Johnson, for his part, also testified that he performed tasks substantially similar to the Claimants.  *Cf.* Vol. III, 118, 130-32.  Indeed, when Johnson first returned to the Library, he managed Brooklyn branch, the same branch where Claimant Schwartz had spent years as an LS-1.  Trial Tr. Vol. II, 40-41; Vol. III, 113.  Thus, the record amply supports that Johnson and the Claimants all performed the same core duties as LS-1s.

Defendants, in response, contend that because each of the branches to which the LS-1s were assigned varied in circulation size, outreach efforts, and physical footprint, the LS-1s jobs are too varied to satisfy the prima facie case.  ECF No. 95 at 1-3 (citing *Kling v. Montgomery Cty. Md.*, 324 F. Supp. 3d 582, 594-95 (D. Md. 2018); *see also Brewster*, 788 F.2d at 991.  The Court disagrees.  The record evidence demonstrates that even according to the Library's own policies and practices, the LS-1s performed substantially the same tasks.  First, the LS-1 job description was the same regardless of branch assignment.  *See* Trial Tr. Vol. I, 188-89; Vol. II, 31-32; Vol. III, 60, 118.  Second, LS-1s were assigned to substitute for one another on a short- or long-term basis without any additional training or alteration in pay.  Trial Tr. Vol. II, 29-32; Vol. III, 58.  Third, the actual core duties of an LS-1 did not differ depending on the branch.  *See, e.g.*, Trial Tr. Vol. I, 62-65, 124, 159; *cf.* Pl. Ex. 28-33.  Accordingly, although differences existed among branches in physical footprint, circulation size and demographics, most relevant to the EPA claim is that none of the differences translated into *job duties* that differed significantly

from one another.  *Brewster*, 788 F.2d at 991; *Spencer v. Virginia State University*, 919 F.3d 199, 204 (4th Cir.).  Plaintiff has therefore established a prima facie case of discrimination.

Defendants, relying on *Spencer v. Virginia State University*, 919 F.3d 199 (4th Cir. 2019), argue that the EEOC has failed to show that the work performed was "virtually identical" in "skills effort and responsibility" because each LS-1 must use their skills differently depending on the branch to which they are assigned.  ECF No. 95 at 1 (citing *Spencer v. Virginia State University*, 919 F.3d 199, 203-04 (2019)).  *Spencer* does not aid the Defendants.  There, the plaintiff, a female sociology professor, maintained that her position was substantially equal to that of two male professors who taught in completely different departments.  Spencer argued that *all* professors, regardless of academic field, performed substantially equal work because they all prepared lessons, managed their classrooms, instructed students and tracked their progress.  *Id.* at 204.  The district court disagreed and granted summary judgment in the University's favor.

The Fourth Circuit affirmed the grant of summary judgment, principally because Spencer's claim of "equal work" rested on a level of generality insufficient to sustain a prima facie case.  The Court particularly noted that the plaintiff's claims necessarily fail as they are so general in description as to be "shared by middle-school teachers and law-school professors, pre-algebra teachers and biomedical-engineering professors" alike, concluding that all professors, across all disciplines, "are not interchangeable like widgets."  *Id.*

In this critical respect, *Spencer* is factually inapposite to this case.  Unlike the level of generality posited by Spencer, the Claimants submitted robust evidence that they all actually perform the same specific duties, regardless of branch assignment.  The Library recognizes as much insofar as it does not hire LS-1s based on the specific needs of any particular branch and directs that all LS-1s must be ready, willing, and able to transfer and substitute at any branch and

at any time.  Nor does the Library condition inter-branch transfer or reassignment on any particular training or education, and such transfer does not result in any pay adjustment.  In short, the Library regards LS-1s to be about as fungible as professional managers can be within the Enoch Pratt system.  *See Allison v. United States*, 39 Fed. Cl. 471, 475 (1997) (Citing *Brennan*, 417 U.S. at 203 n. 24) (finding that Plaintiffs had established a prima facie case where nurses and physician's assistants were treated as fungible).

Importantly, to make the prima face case, the EEOC need not demonstrate absolute identity of all job requirements across Claimants and Johnson.  This point is amply illustrated in *Brewster v. Barnes,* 788 F.2d 985, 991 (4th Cir. 1986).  There, a female corrections officer successfully maintained the prima face case as to a "common core" of such tasks as "supervis[ing] inmates, transport[ing] prisoners, search[ing] visitors, and serving as chief jailor when necessary".  *Id*.  The fact that Brewster supervised women and juvenile inmates, and so was also assigned clerical duties to compensate for the reduced number of supervisees as compared to male inmates, did not constitute such a substantial difference in core responsibilities so as to defeat her claim.  *Id.*  Similarly, the Claimants' differences in job duties, best characterized as slight variations on the pillars of their nearly identical job duties, is to be expected in any job.  Thus, the Court finds that the EEOC has sustained its burden in proving that Claimants, as compared to Johnson, were paid less for performing substantially the same core job duties.

### B.  Defendants' Fourth Exception to the Prima Facie Case

The Court next turns to Defendants' affirmative case – whether they have established that Johnson has been paid more than Claimants based on a "factor other than sex."  29 U.S.C. § 206(d)(1).  To sustain their burden on this exception, the Defendants contend that Johnson was

hired based on his prior, and unique, experience as the Elkton Library branch manager and because the Enoch Pratt system needed to replace two experienced LS-1s who were set to retire. ECF No. 95 at 4.  Defendants further contend that because they set Johnson's pay based on the new MAPS system, this, in combination with their stated rationale for hiring Johnson, establishes that the pay differential was based on a factor other than sex.

The Court begins by noting that throughout the trial, Defendants appear to have misunderstood their burden.  Time and again, Defendants have emphasized that Johnson was *hired* for permissible reasons unrelated to his sex.  *See, e.g.*, ECF No. 95 at 3-5.  But an EPA violation does not begin and end with the *hiring* of a comparator.  Rather it concerns whether the comparator and Claimants performed substantially similar *work* for unexplained discrepant pay. *Md. Insur. Adm.*, 879 F. 3d at 120.  In this respect, it bears repeating that Defendants must produce *evidence* that Johnson was paid more for the job he actually performed as an LS-1 based on a factor other than sex.  *Md. Insur. Adm.*, 879 F. 3d at 120.

Defendants suggest that Johnson negotiated for the higher salary and the Library agreed because of his qualifications and because the salary fell within the permissible MAPS range. ECF No. 95 at 4-5.  But Defendants' evidence does not support that account.  No evidence establishes who ultimately approved Johnson's starting salary of $68,900, an amount even higher than what he had been paid at Cecil County.  Indeed, Johnson testified that he never negotiated his salary, and Anderson corroborates the same.  Trial Tr. Vol. III, 112-13; Vol. V, 66-68. Rather, Johnson testified that he emailed Murphy what he was earning at Cecil County, and the Library responded accordingly.  Trial Tr. Vol. III, 112-13.

Kinsella, as the Library's Chief of Human Resources, ultimately approved the salary and recalls that he did so upon recommendation from Murphy.  Trial Tr. Vol. III, 156-57.  Murphy,

for her part, recalls that "salary negotiations" would have been between Johnson and Kinsella or Anderson, but that she, Murphy, had no part in them.  Trial Tr. Vol. V, 22-24.  Krabbe claimed he had been completely uninvolved in setting Johnson's starting salary and acted only as a "rubber stamp[]."  Trial Tr. Vol. II, 143, 146-47.  In fact, no evidence supports that Johnson submitted any paperwork whatsoever confirming his salary at Cecil County and how such salary reflected his particular experience or supervisory acumen.  Rather, at best, the record reflects that the Library set his salary based solely on Johnson's say-so.

On this record, the Court cannot conclude on what basis Defendants arrived at Johnson's salary.  His salary upon rehire was certainly higher than what he earned at Cecil County.  But no one at the Library could testify as to who even decided what salary Johnson received, let alone the specific reasons behind it.  Thus, on this record, Defendants have failed to sustain their burden of showing that Johnson's salary was based on a factor other than sex.

Defendants' next argue that the MAPS salary system supports that Johnson was hired based on a factor "other than sex."  ECF No. 95 at 3-5.  This argument, too, is unavailing.  The record reflects that while MAPS *permits* a salary adjustment up to the midpoint, it alone does not independently *justify* a paying a male employee a higher wage for performing the same work as his female counterparts.  In fact, the City Human Resources guidance expressly instructs agencies to proceed with caution in setting any given salary for a new hire up to the MAPS midpoint so as to avoid "internal equity issues."  Def. Ex. 7 at 11789.  This the Library did not do.  No evidence reflects that the Library at any point sought to compare Johnson's salary to that of any other LS-1.  Indeed, the Library failed to do so even after Harvey specifically brought the disparity to the Library's attention.  Thus, without more, the Library cannot be said to have

established a factor other than sex as reason for Johnson's higher salary simply because the salary fell within the permissive MAPS range.

In fact, Anderson candidly admitted that the only reason Johnson received a higher salary was serendipity—that he was "fortunate" to be of applying under the MAPS system.  Trial Tr. Vol. V, 88.  But implementation of a public pay system alone cannot justify pay disparity in the absence of any other justification.  *Md. Ins. Adm.,* 879 F.3d at 122-23 (4th Cir. 2018) (Appellant "cannot shield itself from liability under the EPA solely because . . . [it] uses a facially gender-neutral compensation system, [it] still must present evidence that the job-related distinctions underlying the salary plan . . . *in fact* motivated [it] to place the claimants and the comparators on different steps of the pay scale.").  Thus, mere reliance on MAPS in combination with the record evidence, does not establish that Johnson was hired based on a factor other than sex.

Having found that Defendants committed an EPA violation as to the Claimants, the Court next turns to damages.

### C.  Damages

#### 1.  Stipulated Damages

The parties have stipulated to the following back wages as damages:

| | |
|---|---|
| Harvey | $25,801.16 |
| Schwartz | $1,040.88 |
| Young | $18,929.86 |
| Yob | $25,801.16 |
| Julie Johnson | $25,801.16 |

J. Ex.  ¶¶ 49-53.

The Court will, therefore, award them.

### 2.  Liquidated Damages

The EEOC next asks the Court to award liquidated damages in an amount equal to the back wages awarded.  ECF No. 96 at 5.  The FLSA makes clear that liquidated damages are available in an amount equal to the unpaid wages based on any EPA violation.  29 U.S.C. § 216(b).  Accordingly, a liquidated damages award represents the "norm;" a defendant may avoid them only upon a showing that the violation of the EPA was "in good faith" and that the employer had "reasonable grounds" for believing its actions did not violate the law.  *See Acosta v. Mezcal, Inc.*, No. JKB-17-0931, 2019 WL 2550660, at *10 (D. Md. June 20, 2019).  Thus, the employer bears the burden to prove liquidated damages are unwarranted.  *Grove v. Frostburg Nat. Bank*, 549 F. Supp. 922, 945 (D. Md. 1982) (describing the burden as "plain and substantial").  Defendants have failed to meet their burden here.

Defendants advance a similar argument regarding the permissiveness of the MAPS hiring and salary policy.  But for the same reasons discussed already, the Court rejects Defendants contention.  The Library was cautioned specifically to avoid internal pay inequities that result from offering higher starting salaries.  Def. Ex. 7 at 11789.  Yet no one at the Library took heed.  Trial Tr. Vol. II, 177-178; Trial Tr. Vol V, 93-94.

Worse still, Krabbe ultimately withdrew Harvey's IRA upon learning that Harvey was pursuing protected legal action to dispute the very pay discrepancy that the IRA was designed to address.  Trial Tr. Vol. IV, 41; Vol. II, 166-67; Vol. V, 88-90.  That Krabbe justified the withdrawal of the IRA so as to avoid a system-wide application further underscores that he, and thus the Library, knew that the pay discrepancy caused by Johnson's rehire reflected a broader problem with all LS-1 salaries.  Trial Tr. Vol. II, 158-59.  On this record, the Court cannot find that the Library acted in good faith when it continued to pay Harvey and the other Claimants less

than Johnson after learning of the disparity.  Therefore, the Court will award Plaintiff liquidated damages in an amount, per Claimant, equal to their back wages.

### D.  Injunctive Relief

The EEOC also pursues injunctive relief.  First, the EEOC asks this Court to direct that the Library take steps to adjust Claimants' pay information used to set their pension amounts. Second, and more broadly, the EEOC asks this Court to "enjoin[] Defendants from further violating the Equal Pay Act."  ECF No. 96 at 5.  The Court discusses each request separately.

An injunction may issue only if the Plaintiff "can show a 'real or immediate threat of irreparable injury.'"  *E.E.O.C. v. Nucletron Corp.*, 563 F. Supp. 2d 592, 600 (D. Md. 2008) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1383 (4th Cir.1995)).  The FLSA authorizes the EEOC to seek injunctive relief on behalf of the Claimants.  29 U.S.C. § 217; *see also* 29 C.F.R. 1620.33(b).  But some Courts have conditioned such injunctive relief on a showing that "such relief is necessary to prevent future violations."  *See ,e.g.*, *Marshall v. Liggett & Meyers Inc.*, No. C-74-211-D, 1979 WL 79, at *22 (M.D.N.C. Dec. 18, 1979) (quoting *Walling v. Clinchfield Coal Corp.*, 159 F.2d 395, 399 (4th Cir. 1946)); *Usery v. Sears, Roebuck & Co.*, 421 F. Supp. 411, 413-14 (N.D. Iowa 1976) (denying injunction where employer "ha[d] done much to rectify its transgressions"); *Brennan v. Bd. of Education*, 375 F. Supp. 817, 832 (D. N.J. 1974) (granting injunction where Defendants continued to insist it was immune from federal equal pay laws).

As to the broad request for injunction proscribing any unspecified future EPA violations, the Court will deny the request.  The request is not specific to this case, the Claimants or the issues before the Court.  Rather, it is tantamount to the kind of  "obey the law" injunctions that are disfavored as unnecessary exercises of judicial power.  *See E.E.O.C. v. Fed. Express Corp.*, No. WDQ-04-3129, 2006 WL 1134208, at *2 (D. Md. Apr. 25, 2006) ("The ADA remains in

effect, and an injunction to obey that law would add nothing."); *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar. Trade Ass'n*, 389 U.S. 64, 76 (1967)).  For that reason, the Court will not enjoin Defendants from all potential further violations of the EPA.

As to the request for the directive that the Defendants take necessary steps to ensure the Claimants' pensions reflect the pay rate each should have received, the Court grants that requested relief.  Each Claimant testified that the reduced pay each received as compared to Johnson visits a corresponding reduction in the retirement pension benefits.  Pl. Ex. 156 at 21; Trial Tr. Vol. I, 68, 160, 216; Vol. II, 55, 131.  Defendants have presented no evidence or argument to the contrary.  Nor have Defendants' objected to the Court finding that any commensurate reduction in retirement pension is a related damage that merits an order directing Defendants to "institute pension adjustments."  ECF No. 96 at 5.  Finally, the requested relief is specific to the Claimants' injuries suffered as a result of the EPA violations.  Accordingly, the Court will order that Defendants adjust Claimants' retirement benefits consistent with the back pay awarded.

### III.    Conclusion

For the reasons stated above, judgment will be entered in favor of Plaintiff EEOC.

A separate Order will follow.


12/23/2020                                                            /S/
Date                                                Paula Xinis
                                                    United States District Judge